## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

WILLIAM T. WALKER,        )
                      )
     Plaintiff,        )
                      )
     v.               )     Case No. 4:20-cv-01176-AKK-NAD
                      )
CORIZON, LLC, et al.,      )
                      )
     Defendants.     )

## REPORT AND RECOMMENDATION

Plaintiff William T. Walker filed an amended *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging an Eighth Amendment claim for deliberate indifference to his serious medical needs in connection with the treatment of his kidney condition and related conditions. Doc. 45. In his amended complaint, Plaintiff Walker named the following Defendants: Corizon, LLC; Wexford Health Sources, Inc.; Jefferson Dunn, the Commissioner of the Alabama Department of Corrections (ADOC); Leon Bolling, the Warden of the St. Clair Correctional Facility; Dr. Karen Stone; Dr. Scott Bell; Dr. Michael Borowicz; and Dr. Rahim Kassamali. Doc. 45 at 2, 12, 14–15. In his amended complaint, Walker seeks money damages, and declaratory and injunctive relief. Doc. 45 at 22–23.

Consistent with the usual practices of this court and 28 U.S.C. § 636(b), this matter was referred to the undersigned for a preliminary report and recommendation.

*See McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local Rule 72.1. For the

reasons stated below, the undersigned recommends that the court grant Defendants'

motions for summary judgment, and dismiss this action with prejudice.

## BACKGROUND

### A.    Factual background

#### 1.    The court's prior order

The court already has addressed the facts underlying Plaintiff Walker's case.

In its order denying Walker's motion for a temporary restraining order and a

preliminary injunction (Doc. 10), and his motion for emergency assistance (Doc.

32), the court stated as follows (Doc. 44):

> The plaintiff alleges that the defendants failed to provide adequate
> medical care for his serious medical conditions, specifically congestive
> heart failure, diminished kidney function, and anemia. Doc. 4 at 3. He
> states that he has not received physical therapy and treatment by proper
> specialists, who can administer "shots" necessary to improve his heart,
> kidney function, and anemia. *Id.* at 1–2, 7, 9. And in his instant motion
> for temporary restraining order and preliminary injunction, the plaintiff
> asks the court to direct the defendants to arrange for a medical
> examination of his heart and kidney conditions, obtain a report, and
> comply with the prescribed course of treatment. Docs. 10; 10-1 at 1–2.
>
> Corizon held the contract with Alabama Department of
> Corrections to provide health care services to Alabama inmates from
> November 1, 2007 to March 31, 2018. Doc. 12 at 2. The current holder,
> Wexford, has held the contract since April 1, 2018. Doc. 24-3 at 2.
>
> The record shows that at his initial incarceration on April 20,
> 2017, the plaintiff was taking Lipitor, Blayer, Lisinopril, Metformin,
> Coreg, and Plavix, and his EKG and chest x-ray were normal. Doc. 24-
> 5 at 1, 8–9. About a year later, the plaintiff complained of flu-like
> symptoms and had a chest x-ray, which showed "developing bilateral

lower lob infiltrates" and an enlarged heart. *Id.* at 10. He was admitted to Jackson Hospital for new onset of congestive heart failure and renal insufficiency. *Id.* at 11–31.

The plaintiff returned to Jackson Hospital from April 16 to 23, 2018, for acute onset chronic renal failure with anasarca, proteinuria, mild congestive heart failure with evidence of pulmonary hypertension, B12 deficiency, anemia of chronic renal disease, and hypokalemia. *Id.* at 32–39; Doc. 24-6 at 1–40. The plaintiff was started on diuretic therapy, and nephrology recommended "the possibility of having a renal biopsy in the future." Doc. 24-5 at 35. Almost two months after his discharge, the plaintiff had a renal doppler ultrasound, which showed normal kidneys and no significant stenosis of the renal arteries. Doc. 24-7 at 2. An ultrasound of his aorta showed no evidence of Abdominal Aortic Aneurism or significant Atrioventricular Septal Defect. *Id.* at 3–4. A month later, the plaintiff had a chest x-ray that showed no evidence of acute cardiopulmonary pathology. *Id.* at 5–9.

In 2019, the plaintiff was seen at Jackson Hospital on March 18 by the hematology department for a guided bone marrow biopsy. Doc. 24-7 at 34–47. The result showed no evidence of advanced myelodysplasia, acute leukemia, metastatic neoplasm, plasma cell neoplasm, or lymphoma. *Id.* Two months later, the plaintiff refused an annual physical, including labs and exams. Doc. 24-7 at 49. And on October 31, the plaintiff informed the nurse practitioner that he was compliant with his medications and did not have any complaints. *Id.* at 52.

In 2020, the plaintiff had labs done in early January. *Id.* at 53–55. During a visit to the chronic care clinic on January 23, the plaintiff complained of shortness of breath at times but stated that his inhaler helps and he was able to stay active. Doc. 24-8 at 2. He denied having any cardiovascular complaints and noted having swelling in his legs at times, which was managed by Dr. Kassamali. *Id.* Three months later, the plaintiff was seen in the chronic care clinic again, and he had no complaints. *Id.* at 5. However, on April 24, the plaintiff visited the health care unit complaining of chest pains, and the prison transferred him to Brookwood Hospital where he was diagnosed with sepsis due to a urinary tract infection. *Id.* at 9–20. He was prescribed antibiotics and was stable upon discharge. *Id.* at 30–35.

The plaintiff refused his annual physical examination, including all labs and exams, on July 1. *Id.* at 51. Three weeks later, the plaintiff denied having any complaints during a visit to chronic care clinic. *Id.* at 52–54. Thereafter, the plaintiff had labs done on two different days in September, and was described on a different visit that month as stable in a progress note. *Id.* at 55–57. The plaintiff was seen in the chronic care clinic on October 16, 2020, and he reported having shortness of breath after walking a long distance, but his inhaler helped. *Id.* at 59–60. He denied any complaints. *Id.* And, finally, the most recent medical note in the record indicates the plaintiff had labs drawn on December 4, 2020. *Id.* at 62.

Doc. 44 at 2–5 (footnotes omitted).

### 2.    Walker's sworn allegations[1]

In his amended complaint, Walker alleges the following:  Defendants knew about his "kidney disease, congestive heart condition, and anemia," but failed to treat his kidney condition "in accordance with medical protocol," which caused Walker to have a heart attack.[2]  Doc. 45 at 12–13.

Walker suffers from multiple medical conditions, including kidney disease, congestive heart failure, and anemia.  Doc. 45 at 12.  In 2019, 2020, and 2021, officials from ADOC, Corizon, and Wexford informed Dr. Stone (the medical director at St. Clair), that Walker had untreated kidney disease and needed treatment

---

[1] In addition to an amended complaint, Walker also filed multiple other submissions that include allegations of fact, which have been taken into consideration. *See* Doc. 46; Doc. 53; Doc. 71; Doc. 72; Doc. 73; Doc. 76; Doc. 77; Doc. 79; Doc. 81; Doc. 82; Doc. 83; Doc. 84; Doc. 85; Doc. 87; Doc. 88.

[2] As discussed below, the medical records do not show that Walker had a heart attack during the relevant timeframe.

from a specialist who could provide "shots" with the potential to improve his kidney function and consequently his overall medical condition. Doc. 45 at 13.

On March 5, 2019, Walker visited Dr. Robert Avery (a doctor at the Montgomery Cancer Center) to discuss his kidney disease, anemia, and "heart condition." Doc. 45 at 17–18. Dr. Avery noted that he would "arrange for a bone marrow biopsy" and, pending the results, would discuss with Walker "whether or not he is a candidate for erythropoietin shots if the anemia is due to chronic kidney disease." Doc. 45 at 18. In April 2019, Walker was transferred to St. Clair for dialysis treatment. Doc. 45 at 15.

On April 24, 2020, Walker complained of chest pain and was sent to Brookwood Hospital by ambulance.[3] Doc. 45 at 15–16, 20; Doc. 71 at 2. Two weeks prior, Walker had passed kidney stones for which Dr. Stone had prescribed Bactrim.[4] Doc. 45 at 16, 18. At the time, Walker attributed his chest pain to his reaction to Bactrim. Doc. 45 at 16.

Walker has sought treatment for his kidney disease, and "DOC officials" told him that dialysis was "the only treatment that he would receive." Doc. 45 at 18. But

---

[3] Walker alternately alleges that this hospitalization occurred in April 2019 and April 2020. Doc. 45 at 16, 20. The medical records clarify that this hospitalization occurred in April 2020. *See, e.g.*, Doc. 69-2 at 160–62.

[4] Bactrim is an antibiotic often used to treat urinary tract infections. But Bactrim is contraindicated in patients with unmonitored kidney disease and anemia caused by folic acid deficiency. https://www.drugs.com/bactrim.html.

attempting to treat Walker with dialysis has negatively impacted his kidney function and his likelihood of long-term survival.  Doc. 45 at 13.  Dr. Avery alerted St. Clair that "shots" would help his kidney function, but Dr. Stone—who has the authority to obtain specialized medical care outside of ADOC for inmates—has not responded to Walker's requests for treatment.  Doc. 45 at 18.  Among other things, Dr. Stone refused to arrange Walker's follow-up appointment with Dr. Avery.  Doc. 45 at 20–21.

Walker told Dr. Bell, Dr. Borowicz, and Dr. Kassamali (doctors contracted by ADOC) that he feared for his health and requested treatment, but he was not given adequate treatment.  Doc. 45 at 20.  Walker discussed with Dr. Bell his desire for either a kidney transplant or erythropoietin injections,[5] but was purportedly notified that ADOC would not provide either of these treatments.  Doc. 45 at 20.  Instead, medical staff advised Walker to agree to undergo dialysis.  Doc. 45 at 21.  Because of the lack of proper treatment, Walker's condition has deteriorated.  Doc. 45 at 18.

Rather than dialysis (and among other things), Walker should have received a

---

[5] Erythropoietin is a hormone naturally produced in the kidneys.  It aids in the production of red blood cells.  Lack of erythropoietin can cause anemia. Recombinant erythropoietin is a manmade version of this hormone, given by injection, to stimulate the production of red blood cells.  These injections can be used in patients with chronic kidney disease.  However, complications in individuals with heart disease can arise.  *See* https://my.clevelandclinic.org/health/drugs/14573-erythropoietin-stimulating-agents#:~:text=What%20is%20erythropoietin%3F,helps%20make%20red%20blood%20cells.

kidney transplant.  Doc. 45 at 21–22.  ADOC's failure to provide Walker with a kidney transplant amounts to deliberate indifference to his serious medical needs. Doc. 45 at 21.  "ADOC medical staff" has attempted to treat his kidney disease with dialysis rather than a kidney transplant or erythropoietin injections (i.e., the "shots" noted above).  Doc. 45 at 13.

In addition, Corizon and Wexford had a policy and custom that contributed to that deliberate indifference to his serious medical needs.  Doc. 45 at 21.

ADOC will not provide organ transplants, and Walker challenges the "constitutionality" of that unspecified "organ transplant policy."  Doc. 45 at 14. Walker believes that he is eligible for a medical furlough because he can pay for his own procedure,[6] but that ADOC policy requires Walker to establish his ability to pay before he may receive a furlough.  Doc. 45 at 14.

Walker seeks $5 million in damages.  Doc. 45 at 23.  Walker also requests

---

[6] Walker cites the Alabama Medical Furlough Act, Ala. Code § 14-4-1, et seq.  *See* Doc. 45 at 22; *see also* Administrative Regulation 708 (outlining the medical furlough program).  To the extent that Walker might seek relief under the medical furlough program, he must pursue that claim in the Alabama state courts.  Nothing in that Act creates a liberty interest on which due process rights might attach, or any other basis for relief under 42 U.S.C. § 1983.  *See Thomas v. Commissioner, Ala. Dept. of Corrs.*, 2016 WL 2962889, at *6 (N.D. Ala. Jan. 26, 2016) ("Alabama law confers no liberty interest in medical furloughs.  In fact, the Alabama Furlough Act states that '[t]his chapter shall not be deemed to grant any entitlement or right to release.'  Ala. Code, § 14-14-6.  Further, AR 708, Section I states that the medical furlough program is 'discretionary.'  No state created liberty interest can be found in this Administrative Regulation.").

that the court order Defendants to arrange for Walker to have a kidney transplant after he is examined by a qualified expert, provide the treatment recommended by various doctors, and require Dr. Stone to do what is necessary for Walker to receive a medical furlough so that he can pay for his own kidney transplant. Doc. 45 at 22–23.

### 3.  Facts from Walker's records

In April 2017, Walker entered the Alabama prison system through the Kilby Correctional Facility. Doc. 69-2 at 5; Doc. 69-3 at 4; Doc. 69-5 at 2. At that time, his medical history and a list of his medications were obtained. Doc. 69-5 at 2–6. And, at that time, Walker had no documented kidney dysfunction. Doc. 69-2 at 8. An EKG and chest x-ray were normal. Doc. 69-2 at 11–12; Doc. 69-3 at 5.

On May 12, 2017, Walker was transferred to the Staton Correctional Facility. Doc. 69-2 at 3; Doc. 69-3 at 4.

In March 2018, a chest x-ray noted that Walker's heart was enlarged, and that infiltrates appeared in his lower lungs. Doc. 69-2 at 14. On March 3, 2018, Dr. Bell, the medical director at Staton, ordered that Walker be transferred to Jackson Hospital in Montgomery, Alabama, for new-onset congestive heart failure, renal insufficiency, and swelling in his legs. Doc. 69-2 at 15, 18; Doc. 69-5 at 12.

Records from Jackson Hospital show that Walker was diagnosed with congestive heart failure, chronic kidney disease ("probably stage 3"), anemia,

hypertension, and diabetes. Doc. 69-2 at 18. These records reflect that, while Walker's condition generally improved, his renal function continued to decline, and that he could be treated as an outpatient. Doc. 69-2 at 19. The hospital discharged Walker to Kilby and noted that he would receive follow-up treatment there. Doc. 69-2 at 18–19. Walker remained at Kilby, including spending time in the infirmary, until March 19, 2018, when he returned to Staton. Doc. 78-2 at 4.

On April 16, 2018, Walker was readmitted to Jackson Hospital. Doc. 69-2 at 37. He complained of shortness of breath and swelling in his legs. Doc. 69-2 at 40. X-rays again showed that Walker's heart was enlarged. Doc. 69-2 at 49, 51. An ultrasound noted a small cyst on Walker's right kidney, but no other abnormalities. Doc. 69-2 at 52. At discharge, Walker's diagnoses included acute-on-chronic renal failure, proteinuria with probable need for renal biopsy, mild congestive heart failure, anemia, hypokalemia, hypertension, diabetes, and coronary artery disease. Doc. 69-2 at 38, 41. A nephrologist noted a renal biopsy was indicated and could be performed on an outpatient basis.[7] Doc. 69-2 at 39, 54, 58.

On May 4, 2018, Walker again returned to Staton. Doc. 69-2 at 84; Doc. 78-2 at 3. On May 16, 2018, Walker refused various medical tests. Doc. 69-2 at 85.

---

[7] In one of his responses, Walker alleges that on March 3, 2018, and again on April 16, 2018, "D.O.C. officials canceled my biopsy that was approved and scheduled by Dr. Lopez." Doc. 83 at 3. The medical records reflect that in April 2018, a nephrologist "recommended for the possibility of having a renal biopsy in the future." Doc. 69-2 at 39.

In June 2018, an ultrasound of Walker's kidneys noted that they appeared normal. Doc. 69-2 at 87. An ultrasound of his aorta at the same time found no significant disease. Doc. 69-3 at 9.

A July 2018 chest x-ray showed that Walker's lungs were clear, and that his heart was enlarged without congestive heart failure. Doc. 69-2 at 90.

In August and September 2018, Walker underwent imaging of his digestive system for diagnostic purposes related to his anemia and because of blood in his stools. Doc. 69-2 at 95–116. The imaging found two polyps that were removed. Doc. 69-2 at 97, 105.

On March 5, 2019, Walker saw Dr. Avery at the Montgomery Cancer Center for anemia. Doc. 53 at 3. Medical records from the visit reflect that Walker had anemia, likely due to chronic kidney disease, but possibly due to other conditions. Doc. 53 at 4. Dr. Avery noted that he would "arrange for a bone marrow biopsy" and, pending the results, would discuss with Walker "whether or not he is a candidate for erythropoietin shots if the anemia is due to chronic kidney disease." Doc. 53 at 4. Although Walker claims this biopsy never was performed, and that "DOC officials" told him dialysis was the only treatment he would receive (Doc. 45 at 18), records show that Wexford referred Walker to Jackson Hospital for a bone marrow biopsy on March 6, 2019. Doc. 69-2 at 117–132. The biopsy was performed on March 7, 2019, and the results were sent to Dr. Avery for review. Doc. 69-2 at 118–

19.  The results of the biopsy were normal.  Doc. 70-1 at 3; Doc. 70-2 at 10.

In April 2019, Walker was transferred from Staton to St. Clair for dialysis treatment.  Doc. 69-2 at 133; Doc. 78-2 at 2.  On April 19, 2019, Dr. Kassamali—a board-certified nephrologist—first saw Walker as a patient based on a referral for the possible initiation of dialysis.  Doc. 70-1 at 3.  Dr. Kassamali treated Walker pursuant to a contract between Wexford and non-party Eastern Nephrology, P.C. Doc. 70-1 at 2.  Dr. Kassamali describes Walker as a patient in his late 70s with progressive chronic kidney disease.  Doc. 70-1 at 3.  Dr. Kassamali continues to treat Walker.  Doc. 70-1 at 6.

When he first saw Walker, Dr. Kassamali "conducted a detailed assessment consisting of history taking, physical examination, and reviewing past medical records, vital signs, investigation reports, and medications."  Doc. 70-1 at 3.  Dr. Kassamali noted Walker's recent bone marrow biopsy, which showed normal results, and noted that Walker's anemia had improved and was "expected to normalize."  Doc. 70-1 at 3–4.  Dr. Kassamali concluded that Walker did not need immediate dialysis.  Doc. 70-1 at 4; Doc. 70-2 at 10.  Dr. Kassamali explained to Walker that his kidney condition had no identifiable "reversible cause," and that the goal was to adopt a healthy lifestyle, but "due to the progressive nature of the disease, his condition could worsen."  Doc. 70-1 at 4.

On May 30, 2019, Walker refused to have a physical.  Doc. 69-2 at 86, 134.

11

In August 2019, Walker's kidney function was stable and his anemia had "further improved," and Dr. Kassamali again believed dialysis was not indicated. Doc. 70-1 at 4.

In October 2019, Walker's blood pressure was noted to be elevated, but he stated no other complaints. Doc. 69-2 at 137.

In January 2020, when Dr. Kassamali examined Walker, he noted edema in addition to Walker's prior diagnoses. Doc. 69-2 at 141. Walker's anemia continued to improve. Doc. 70-1 at 5. But Dr. Kassamali also noted that Walker's chronic kidney disease had progressed to stage IV, which Dr. Kassamali had expected. Doc. 70-1 at 5. Again, Dr. Kassamali did not think Walker needed dialysis. Doc. 70-1 at 5; Doc. 70-2 at 8.

At a St. Clair chronic care follow-up appointment in January 2020, Walker stated that he still had shortness of breath, but his inhaler helped and he could stay active. Doc. 69-2 at 142. He also relayed that Dr. Kassamali had prescribed Lasix for the swelling in his legs. Doc. 69-2 at 142.

At an April 2020 chronic care appointment, Walker denied any complaints. Doc. 69-2 at 145. But, on April 24, 2020, Walker complained of chest pain and was sent to Brookwood Hospital by ambulance. Doc. 69-2 at 149–50; Doc. 69-5 at 114. Walker was discharged from Brookwood Hospital with diagnoses of chest pain, sepsis from a urinary tract infection, coronary artery disease, hypertension,

hyperlipidemia, and a note to avoid Bactrim as it may have caused Walker to have an allergic reaction. Doc. 69-2 at 160–61, 167, 172.

On April 29, 2020, Walker was released from Brookwood Hospital and placed in the infirmary at St. Clair. Doc. 69-2 at 149, 177. The following day, Walker stated, "I feel good," and was returned to the general population. Doc. 69-2 at 168, 182.

On May 15, 2020, at a follow-up examination, Walker stated that he felt better. Doc. 69-2 at 183.

In May 2020, when Dr. Kassamali saw Walker, he noted that Walker's kidney disease had progressed to stage V, which was expected. Doc. 70-1 at 5. Walker's anemia remained stable. Doc. 70-1 at 5.

On July 1, 2020, Walker refused to have a physical. Doc. 69-2 at 86, 191.

On July 20, 2020, at a chronic care appointment, Walker was noted to be compliant with all medication and denied any complaints. Doc. 69-2 at 192.

Walker next saw Dr. Kassamali on September 18, 2020. Doc. 70-1 at 5–6. Dr. Kassamali opined that Walker's kidney disease was stable and that, because his anemia was stable, Walker was not a candidate for erythropoietin. Doc. 70-1 at 5–6.

As reflected in January 2021 records, Walker continued to have no complaints and reported that he felt well. Doc. 69-2 at 203–05. When Dr. Kassamali saw

Walker in January 2021, he noted that Walker's kidney disease had improved and was back to stage IV.  Doc. 70-1 at 6.  His anemia also was stable, and consequently treatment with erythropoietin was not appropriate.  Doc. 70-1 at 6.

In April 2021, Walker reported at a chronic care appointment that he had less shortness of breath and was exercising regularly.  Doc. 69-2 at 206.

In May 2021, Walker saw Dr. Kassamali, who again noted that Walker remained stable, that his anemia had resolved, and that neither dialysis nor erythropoietin was indicated.  Doc. 70-1 at 6–7; Doc. 70-2 at 4.

In June 2021, Walker stated that he took one nitroglycerin dose for chest pain two weeks prior, but that he had been doing well since, and that his shortness of breath had completely resolved.  Doc. 69-2 at 208.

In July 2021, Walker refused a routine screening.  Doc. 69-2 at 210.

In August 2021, Walker reported that his arms and hands became numb at times, usually at night.  Doc. 69-2 at 212, 214.  Walker was referred for a nerve conduction study.  Doc. 69-2 at 213.

On October 8, 2021, Walker returned to Brookwood Hospital after complaining of chest pain with radiation to his left arm.  Doc. 69-2 at 209, 214, 216–37.  He was discharged two days later with diagnoses of chest pain, history of coronary artery disease, chronic congestive heart failure, moderate aortic valve insufficiency, hypertension, stage IV chronic kidney disease, and prediabetes.  Doc.

69-2 at 219.  At discharge, Walker went to the infirmary at St. Clair for observation.  Doc. 69-2 at 243, 244, 246.  He reported that he "feels great" and was "ready to walk 2 miles."  Doc. 69-2 at 243.

In November 2021, when Walker saw Dr. Kassamali, Dr. Kassamali noted that Walker's blood pressure had increased and that his kidney disease was approaching late stage IV.  Doc. 70-1 at 7.

At that time, Walker's anemia levels remained stable, so he still was not a candidate for erythropoietin.  Doc. 70-1 at 7; Doc. 70-2 at 2.

At no time did Dr. Kassamali believe that erythropoietin or a kidney transplant would have been an appropriate treatment for Walker.  Doc. 70-1 at 7.

**B.     Procedural background**

On August 14, 2020, Walker filed his initial complaint, which was signed on August 9, 2020.  Doc. 1.  After filing a first amended complaint (Doc. 4), Walker filed numerous motions, including a motion for a temporary restraining order (Doc. 10), and a motion for emergency assistance (Doc. 32), both of which related to his ongoing medical issues.  As noted above, the court denied Walker's motions for a temporary restraining order and for emergency assistance.  Doc. 44.

On March 30, 2021, Walker filed a second and final amended complaint (Doc. 45), which is the operative complaint before the court.  *See Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (an amended pleading

supersedes the former pleading).[8]  The named Defendants then were ordered to file special reports responding to Walker's allegations.  Doc. 55.

In response to that order, Defendants filed six separate special reports, supported by affidavits and other evidence.  Doc. 59; Doc. 60; Doc. 61; Doc. 69; Doc. 70; Doc. 78.  Defendants asserted that the court should grant summary judgment in their favor for a variety of reasons, including that there is no triable issue on Walker's claim for alleged deliberate indifference to his medical needs.  Doc. 59; Doc. 60; Doc. 61; Doc. 69; Doc. 70; Doc. 78.

On March 14, 2022, Defendants' special reports were construed as motions for summary judgment, and Walker was ordered to file a final response within 21 days.  Doc. 80; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). Walker already had filed multiple prior responses.  Doc. 71; Doc. 72; Doc. 73; Doc. 76; Doc. 77; Doc. 79.  That March 14, 2022 order notified Walker that, under Federal Rule of Civil Procedure 56, the party opposing a summary judgment motion must respond with counter-affidavits and/or documents to set forth specific facts demonstrating the existence of a genuine dispute of material fact to be litigated at trial.  Doc. 80.  That order also notified Walker of the consequences that can result if the party opposing a summary judgment motion does not comply with Rule 56. Doc. 80.

---

[8] This case later was reassigned to the undersigned.

Walker filed two responses. Doc. 81; Doc. 82. Walker also filed an affidavit in support of his claims. Doc. 83. Walker then filed an additional affidavit in support of his claims. Doc. 84. He also submitted a "Request For Special Findings" (Doc. 85), a "Motion For Discovery And Inspection" (Doc. 86), a "Supplemental Declaration Of Facts" (Doc. 87), and a "Declaration" (Doc. 88). All of Walker's filings have been reviewed and considered in connection with this report and recommendation.

## C. Legal background (deliberate indifference to serious medical needs)

The Eighth Amendment[9] prohibits "deliberate indifference to a prisoner's serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To state an actionable claim under § 1983 for lack of medical treatment, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106.

On a claim for deliberate indifference, a plaintiff must show the following:

_____

[9] Because Walker is a convicted prisoner, his rights arise from the Eighth Amendment. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 31–32 (1993); *Andujar v. Rodriquez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007) (stating that the Eighth Amendment protects convicted prisoners, and that the Fourteenth Amendment protects pretrial detainees, but that the decisional law is the same under both amendments). The Eighth Amendment prohibition against cruel and unusual punishment was made applicable to the States through incorporation under the Fourteenth Amendment. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010).

"(1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Gilmore v. Hodges*, 738 F.3d 266, 273–74 (11th Cir. 2013) (quotation marks omitted).

To satisfy this standard, a plaintiff must demonstrate more than negligence or "an inadvertent failure to provide adequate medical care." *Estelle*, 429 U.S. at 105–06; *see also Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (merely accidental inadequacy is insufficient to state a claim under the Eighth Amendment). Medical treatment does not have to be "perfect, the best obtainable, or even very good," and violates the Eighth Amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Keohane v. Florida Dept. of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505, 1510 (11th Cir. 1991)).

Furthermore, the standard for deliberate indifference requires a plaintiff to show facts to meet both an objective and a subjective component. *Gilmore*, 738 F.3d at 274. First, an objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—i.e., a medical condition that, "if left unattended, poses a substantial risk of serious harm." *Keohane*, 952 F.3d at 1266 (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th

Cir. 2004)).

Second, on the subjective component, a plaintiff must demonstrate that the defendant prison officials acted with "deliberate indifference" to the objectively serious medical need by showing "(1) that they had 'subjective knowledge of a risk of serious harm' and (2) that they 'disregard[ed]' that risk (3) by conduct that was 'more than mere negligence.'" *Id.* (quoting *Brown*, 387 F.3d at 1351). At a minimum, to establish deliberate indifference, a plaintiff must present evidence that a defendant was aware of facts from which the defendant could have drawn an inference that the plaintiff faced a substantial risk of serious harm, and that the defendant actually drew that inference. *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1234 (11th Cir. 2010).

A defendant's deliberate denial or delay of medical treatment for a serious medical condition can satisfy this standard. *Barfield v. Brierton*, 883 F.2d 923, 938 (11th Cir. 1989).

But, without more, a prisoner plaintiff cannot show deliberate indifference where he received care but might have preferred a different type of treatment. *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985). And the obligation to provide medical care "doesn't necessarily demand curative care." *Hoffer v. Secretary, Fla. Dept. of Corrs.*, 973 F.3d 1263, 1272 (11th Cir. 2020).

In this regard, the Eleventh Circuit has "emphasized" that "a simple difference

in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266 (quoting *Harris*, 941 F.2d at 1505). Where a plaintiff's allegations focus on the adequacy of the care that the defendants provided, courts hesitate to question the medical judgments made. *Lloyd v. Van Tassell*, 318 F. App'x 755, 760 (11th Cir. 2009) (citing *Harris*, 941 F.2d at 1507). Instead, deliberate indifference requires that a defendant intentionally failed to provide medical care. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477

U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

While the court is required to construe all facts and reasonable inferences in favor of the nonmovant, the court need not extend that standard to a version of facts that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Medical records are evidence that can "blatantly contradict" a nonmovant's version of the facts. *See, e.g.*, *Sumlin v. Lampley-Copeland*, 757 F. App'x 862, 867 (11th Cir. 2018); *Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("Although [the plaintiff] attempts to overcome summary judgment by offering his own sworn statements . . . to support

his allegations, the contemporaneous medical records and opinions of the examining medical doctors show that this purported evidence is baseless.").

## DISCUSSION

As noted above, the court already has addressed the merits of Plaintiff Walker's claim. In discussing Walker's "likelihood of success on the merits" in its order denying Walker's motions for temporary and preliminary injunctive relief (Doc. 10; Doc. 32), the court stated as follows (Doc. 44):

> . . . [T]he plaintiff cannot show a substantial likelihood that he will prevail against Dunn and Bolling. Neither Dunn nor Bolling are health care providers, and they are not involved in the day-to-day medical care of inmates. Docs. 24-1 at 2; 24-2 at 2. And even if they were involved in the plaintiff's medical care, the plaintiff has failed to show that they acted deliberately indifferent to his medical needs. . . .

> Nor on this record does it appear that the plaintiff can prevail on the merits. In fact, the record belies the plaintiff's contention that the defendants failed to provide adequate medical care for his congestive heart failure, kidney problems, and anemia. The record shows instead that the plaintiff has received regular lab monitoring and is seen in the chronic care clinic regularly. Docs. 24-7 at 49, 52–55; 24-8 at 2, 5, 51–60, 62. He is being treated for his heart condition, kidney issues, and anemia (including receiving various tests and x-rays), and underwent a bone marrow biopsy in March 2019. Docs. 24-5 at 8–10, 35; 24-7 at 2–9, 34–47. Contrary to the plaintiff's contention that his medical needs are being ignored, the record shows that his allegations at most establish that he disagrees with the prison medical staff on how they should treat him and the timeliness of his treatment. But, "'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Brennan v. Thomas*, 780 F. App'x 813, 821 (11th Cir. 2019) (citing *Melton v. Abston*, 841 F.3d 1207, 1224 (11th Cir. 2016)).

Put simply, the plaintiff has alleged no facts tending to show that the defendants have been deliberately indifferent to his medical needs. . . .

Doc. 44 at 8–10.

For the reasons the court already has addressed, and for the reasons discussed below, the court should grant Defendants' motions for summary judgment, and dismiss this action with prejudice.

## I. The statute of limitations bars Walker's claims against Corizon and Dr. Bell.

As a preliminary matter, because the applicable statute of limitations bars Walker's claims against Corizon and Dr. Bell, those claims are due to be dismissed pursuant to 28 U.S.C. § 1915A. Under 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B)(i), the court can dismiss a claim as "frivolous where it lacks an arguable basis" in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim is frivolous as a matter of law where a defendant is immune from suit, or where the claim seeks to enforce a legal right that clearly does not exist. *Id*. at 327; *see* 28 U.S.C. § 1915A(b)(2); 28 U.S.C. § 1915(e)(2)(B)(iii). Relevant here, "[t]he expiration of the statute of limitations is an affirmative defense the existence of which warrants a dismissal as frivolous." *Clark v. Georgia Pardons & Paroles Bd.*, 915 F.2d 636, 641 n.2 (11th Cir. 1990).

The statute of limitations for a § 1983 action is the statute of limitations for personal injury actions in the forum state. *Owens v. Okure*, 488 U.S. 235, 249–50

(1989); *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008) ("All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.").

In Alabama, the applicable limitations period is two years. *See* Ala. Code § 6-2-38(l) (two-year statute of limitations for personal injury actions); *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989). The statute of limitations begins to run when the facts that would support a claim for relief are apparent or should be apparent to a person with a reasonably prudent regard for his rights. *Rozar v. Mills*, 85 F.3d 556, 561–62 (11th Cir. 1996). So, the limitations period begins to run when the plaintiff knows (1) that he has suffered the injury that forms the basis for his complaint, and (2) who caused that injury. *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).

Walker filed this action on August 9, 2020.[10] Doc. 1 at 10, 17. Consequently, his claims arising before August 9, 2018, are barred by the two-year statute of limitations. *See Owens*, 488 U.S. at 249–50; Ala. Code § 6-2-38(l).

Walker does not dispute the fact that Corizon's contract to provide medical

---

[10] As noted above, Walker signed the complaint on August 9, 2020. Doc. 1 at 10, 17. And, under the prison mailbox rule, the court presumes that a complaint was filed on the date that the prisoner plaintiff signed it. *See Houston v. Lack*, 487 U.S. 266, 271–72 (1988).

care to Alabama prison inmates expired on March 31, 2018. Doc. 60 at 1.

Likewise, Dr. Bell avers in his declaration, and Walker does not dispute, that he left employment with Wexford on July 21, 2018, and that he has not treated any Alabama prison inmate since then. Doc. 78-1 at 2–3.

Walker has not identified any facts that could support a finding that he would not have been aware of any injury that Corizon or Dr. Bell allegedly had caused before March or July 2018, when Corizon and Dr. Bell stopped treating Alabama prison inmates. *See Chappell*, 340 F.3d at 1283. Nor has Walker identified any facts that could support any basis for tolling the statute of limitations in this case.

Thus, Walker's claims against Corizon and Dr. Bell are untimely and are due to be dismissed with prejudice under § 1915A. *See* 28 U.S.C. § 1915A(b)(2). In addition (and as discussed below), Walker's claims against Corizon and Dr. Bell alternatively are due to be denied and dismissed because Walker has not identified facts sufficient to create a triable issue on his alleged deliberate indifference claims.

II. **Walker's claims against Corizon and Wexford fail because he has not shown that a custom or policy of Corizon or Wexford resulted in deliberate indifference.**

Walker's claims against Corizon and Wexford fail because he has not identified any facts that could support a finding that a custom or policy of Corizon or Wexford resulted in deliberate indifference. As discussed above, Corizon avers— and Walker does not dispute—that it has not provided any medical care to Alabama

prison inmates since its contract with ADOC ended on March 31, 2018. Doc. 60 at 1. Wexford avers that, under its contract with ADOC, it began providing medical care to state inmates on April 1, 2018. Doc. 61 at 2. Both Corizon and Wexford aver that they had no custom or policy that resulted in deliberate indifference to Walker's medical needs. Doc. 60; Doc. 61. Walker alleges that the "injuries to his kidneys and his kidney injuries [were] the result of Corizon, LLC and Wexford Health Sources, Inc. policy and customs." Doc. 45 at 21. However, Walker does not specify any purported policy or custom and does not allege or identify facts regarding how any policy or custom of Corizon or Wexford conceivably could have led to his injuries.

Without more, a plaintiff cannot premise a § 1983 claim on a corporation's role as the employer or supervisor of doctors who provided a plaintiff's medical care. Where a private entity like Corizon or Wexford "contracts with a county [or state] to provide medical services to inmates," it becomes "the functional equivalent of the municipality [or state entity]" for the purposes of liability under § 1983, such that liability may not be based on a theory of *respondeat superior*. *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997)); *see also Phillips v. Pavirov*, No. 5:19-CV-00888-LCB-HNJ, 2019 WL 4054110, at *7 (N.D. Ala. July 30, 2019), *report and recommendation adopted*, 2019 WL 4038554 (N.D. Ala. Aug. 27, 2019) (citing *Buckner*, 116 F.3d at

452–53, and stating that a plaintiff could not "lodge a claim for deliberate indifference to his medical needs against" Corizon or Wexford "based on the actions of its employees" where there was no constitutional violation due to an established custom or policy). Consequently, to prove a deliberate indifference claim against a private entity providing such medical care, a prisoner must prove that the entity "had a 'policy or custom' of deliberate indifference that led to the violation of his constitutional right." *Craig*, 643 F.3d at 1310 (quoting *Monell v. Department of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978)); *accord Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 917 (11th Cir. 2017).

In this regard, a "single incident of unconstitutional activity" is insufficient to show a policy or custom to establish liability; usually a plaintiff must show a "pattern of similar constitutional violations." *Craig*, 643 F.3d at 1310 (quotation marks omitted). "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotation marks omitted). A custom is "a practice that is so settled and permanent that it takes on the force of the law." *Id.* (quotation marks omitted).

Here, Walker avers that Corizon and Wexford were the employers of the individual doctors whom he has named as Defendants in this action. But Corizon and Wexford cannot be held liable for the actions of their employees or agents under

a theory of *respondeat superior*. *See Craig*, 643 F.3d at 1310.

To the extent that Walker alleges that Corizon or Wexford had a custom or policy that resulted in his injuries, Walker has identified no factual basis for a finding that a policy or custom of either Corizon or Wexford caused him any harm. At most, Walker has alleged (without any other factual support) that he was harmed by ADOC's policy of "not treating inmates for kidney diseases prior to plac[ing] them on" dialysis and not providing organ transplants. Doc. 45 at 13–14. But that unsupported allegation relates only to a purported ADOC policy, not a policy of Corizon or Wexford. While Walker's amended complaint does include conclusory averments—again, without any other factual support—that Corizon and Wexford had policies of deliberate indifference that led to his injuries, Walker cannot create a triable issue based on such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" without more specific allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In addition, Walker avers only that he was offered dialysis and denied a kidney transplant and erythropoietin "shots" (*see* Doc. 45 at 18). Walker alleges a "single incident" of allegedly unconstitutional activity—his own purportedly deficient treatment. *See Craig*, 643 F.3d at 1310. He does not allege that any other inmates received improper treatment. Thus, he does not allege a pattern of similar constitutional violations, as is required to show the necessary policy or custom. *See*

*id.* In other words, Walker does not show the "persistent and wide-spread practice" that is necessary to establish liability against Corizon and Wexford. *McDowell*, 392 F.3d at 1290.

### III. Walker's claims against Dunn and Bolling fail because he cannot show supervisory liability.

Walker's claims against Dunn and Bolling fail because he cannot show facts to create a triable issue on supervisory liability. Commissioner Dunn and Warden Bolling both aver that they have no knowledge of the medical care or treatment that Walker has received. Doc. 59-1; Doc. 59-2. ADOC contracts with Wexford to provide medical care to Alabama state inmates, and Dunn and Bolling make no decisions related to a prisoner's medical care. Doc. 59-1; Doc. 59-2. Walker alleges that Dunn and Bolling had knowledge of his medical conditions and were responsible for supervising conditions at their facilities. Doc. 45 at 13–15; Doc. 88.

Because Walker has not averred or identified any facts that either Dunn or Bolling is a medical professional or was directly involved in his medical care, the only possible basis for a claim against either of them would be their respective roles as supervisors of their facilities. *See, e.g.*, *Sealey v. Pastrana*, 399 F. App'x 548, 552 (11th Cir. 2010).

But, generally speaking, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014); *see*

*also Iqbal*, 556 U.S. at 676 (holding that the doctrine of *respondeat superior* does not apply in a § 1983 action). Instead, a supervisor can be liable only if the supervisor participated directly in the unconstitutional conduct, or if there is a causal connection between the supervisor's actions and the alleged constitutional violation. *Harrison*, 746 F.3d at 1298 (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)); *see also Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019) (similar).

A plaintiff can establish such a causal connection only when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation," and he or she fails to do so, (2) a supervisor's "custom or policy" results in "deliberate indifference to constitutional rights," or (3) "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Harrison*, 746 F.3d at 1298 (citation omitted).

Here, Walker avers that, because "prison officials" sent him to St. Clair for "pre-dialysis," instead of sending him to Dr. Avery at the Montgomery Cancer Center, his kidney condition worsened. Doc. 83 at 3. Walker avers that "Dunn & Bolling were both informed of Plaintiff's health issues but they & their people in management ignored the request from Plaintiff & his Family." Doc. 79 at 1. Walker also asserts that "D.O.C. officials" denied Dr. Avery's request for Walker to receive erythropoietin injections. Doc. 82 at 3.

By affidavit, both Dunn and Bolling state that they have no knowledge of Walker's medical care or his medical complaints. Doc. 59-1; Doc. 59-2. Dunn avers that he does not have any involvement with the daily medical treatment provided to inmates at St. Clair. Doc. 59-1 at 3. Bolling avers that he had no involvement with the medical care Walker received at St. Clair, and does not know Walker. Doc. 59-2 at 2–3.

Walker does not allege, and the record does not show, that Dunn or Bolling participated directly in his allegedly deficient medical care. Moreover, Walker provides no basis on which a reasonable jury could find that either Dunn or Bolling is "the official" that is "responsible for the challenged action," as required to show a connection to the alleged unconstitutional acts at issue. *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988).

Walker asserts only that Dunn and Bolling had some knowledge of his medical condition and had general supervisory authority over their facilities and employees, not that Dunn or Bolling affirmatively made any decisions or took any actions regarding Walker's medical treatment. *See* Doc. 14 at 13–15; Doc. 79 at 1. Dunn and Bolling also aver that they have no role in decisions relating to medical treatment of Walker or other inmates. Doc. 59-1; Doc. 59-2. Walker does not show that Dunn and Bolling had any notice—stemming from a history of abuse—of issues with medical policies, that they had any role in establishing a specific custom or

policy related to medical care, or that they directed subordinates to act unlawfully or failed to stop them from acting unlawfully regarding medical care. *See Harrison*, 746 F.3d at 1298.

Rather, Walker's allegations rest on a conclusory, unsupported assertion that Dunn and Bolling were responsible for the people they supervised who made the allegedly wrongful medical decisions. In other words, Walker alleges that Dunn and Bolling were responsible for, and permitted, the medical decisions of their subordinates—i.e., the medical professionals who managed Walker's care. But, with respect to medical care, "supervisory officials are entitled to rely on the medical judgments made by medical professionals responsible for prisoner care." *Williams v. Limestone Cty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) (citations omitted). "The law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong." *Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007). Walker has provided no indication that Dunn or Bolling—neither of whom is a medical professional—directly supervised medical personnel or had knowledge that any sort of intervention in Walker's treatment was medically necessary. Instead, he has simply asserted that, at most, Dunn and Bolling permissibly relied on medical judgments made by qualified medical professionals,

which is not enough to establish liability. *See Williams*, 198 F. App'x at 897.

Conclusory allegations that Defendants Dunn and Bolling should be liable because of their roles within the Alabama prison system, without any specific facts that could support an inference that they took any action or had any knowledge related to Walker's medical care, cannot create a triable issue of fact for a jury.

## IV. Walker cannot show that there is a triable issue on his deliberate indifference claims against the individual doctors—Dr. Bell, Dr. Stone, Dr. Borowicz, and Dr. Kassamali.

Walker cannot show facts to create a triable issue on his deliberate indifference claims against the individual doctors who participated in his care—i.e., Dr. Stone, Dr. Bell, Dr. Borowicz, and Dr. Kassamali.

To show deliberate indifference, a plaintiff must produce evidence that each named defendant knew about the plaintiff's serious medical needs and intentionally failed or refused to provide adequate medical care. *McElligott*, 182 F.3d at 1255. Each named defendant "must be judged separately and on the basis of what that person kn[ew]" (*Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)), and not on the medical outcome of a prescribed course of treatment (*see, e.g.*, *Bass v. Sullivan*, 550 F.2d 229, 231–32 (11th Cir. 1977) (even though the prisoner plaintiff ultimately lost his legs to gangrene, the defendant doctor's treatment was not deliberately indifferent)).

In this case, Walker has not alleged or identified specific facts that could

create a triable jury issue on whether any of the individual doctor's conduct was deliberately indifferent to his medical needs.

### A. Overarching allegations relating to treatment of Walker's kidney disease

Walker names Dr. Bell, Dr. Stone, Dr. Borowicz, and Dr. Kassamali individually as Defendants in his amended complaint, but primarily focuses his allegations on general assertions that he did not receive proper medical treatment related to his kidney disease—because he was only offered dialysis, not erythropoietin shots or a kidney transplant. Doc. 45. Walker blames these doctors because "the ADOC Committee" will not approve the treatment he wants. Doc. 83 at 4. Walker states that he has declined to have the offered treatment—dialysis—instead opting for his kidney function to become even further reduced, while he waits for this court to rule. Doc. 83 at 4.

The record in this case reveals no mention by any doctor of a recommendation for Walker to be evaluated for a kidney transplant. Because of the condition of Walker's kidneys, ADOC placed him in St. Clair, where dialysis is available. Once there, Dr. Stone referred Walker to Dr. Kassamali, a kidney specialist, for treatment. And Dr. Kassamali believed Walker's kidney function to be sufficient, such that he did not need dialysis until November 2021, over a year after Walker filed this action. Doc. 70-1 at 7; Doc. 70-2 at 2.

Rather than demonstrating deliberate indifference to his medical needs,

Walker has shown only that he disagrees with the medical treatment provided. However, "[i]t is legally insufficient to sustain a cause of action for deliberate indifference to serious medical needs simply because the inmate did not receive the medical attention he deemed appropriate." *Abel v. Lappin*, 661 F. Supp. 2d 1361, 1373 (S.D. Ga. 2009) (*citing Harris*, 941 F.2d at 1505). Instead, to establish inadequacy, a plaintiff must put forth some evidence of what reasonable care for his conditions is, either through prior court decision or by demonstrating "contemporary standards and opinions of the medical profession." *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). And an inmate who receives medical care, but simply desires a different diagnosis or treatment, cannot show deliberate indifference. *Hamm*, 774 F.2d at 1575; *see Adams*, 61 F.3d at 1545; *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment." (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Here, Walker has provided no medical documentation or other evidence of any kind that the treatment he received was so far outside the bounds of reasonableness that it entered the realm of deliberate indifference. Imperfect medical treatment, "although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, 429 U.S. at

105. Even medical malpractice—if Walker hypothetically could make that showing in this case—does not necessarily amount to a constitutional violation. *See McElligott*, 182 F.3d at 1254.

Nothing in the evidence before this court establishes that the individual doctor Defendants "course of treatment presented a substantial risk of serious harm . . . but [they] persisted in the course of treatment anyway." *Colardo-Keen v. Rockdale Cty., Ga.*, 775 F. App'x 555, 567 (11th Cir. 2019) (citing *Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999)); *see also Monteleone v. Corizon*, 686 F. App'x 655, 659–60 (11th Cir. 2017) (holding that the failure to use a more effective medication may have constituted negligence but did "not rise to the level of deliberate indifference" (citation omitted)); *Tucker v. Busbee*, 619 F. App'x 868, 870 (11th Cir. 2015) ("Negligence in diagnosing or treating a medical condition, including an inadvertent failure to provide adequate medical care, does not state a valid claim for deliberate indifference.").

Walker received care for his kidney disease, including the opportunity to undergo dialysis. Walker has not demonstrated that the medical care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Keohane*, 952 F.3d at 1266. Indeed, hypothetically considering appropriate treatment for kidney disease, the Eleventh Circuit itself has suggested, "Surely the Constitution doesn't require prison

authorities to schedule an immediate transplant, even though that might be the most effective, and permanent, solution. Rather, even for an inmate with end-stage renal disease, a regular course of dialysis treatments would doubtlessly pass constitutional muster. And for those whose condition hasn't progressed to near-complete kidney failure, even less aggressive measures—say, monitoring and managing diet and exercise—would presumably suffice." *Hoffer*, 973 F. 3d at 1272–73. Thus, practically speaking, the Eleventh Circuit already has concluded in an analogous circumstance that the exact care provided to Walker passes constitutional muster.

As such, Walker fails to show a lack of medical care such that a reasonable jury could find that any of the individual doctor Defendants acted with deliberate indifference to his medical needs.

### B.  Allegations against each individual doctor

For sake of completeness, but consistent with the discussion above (*see supra* Part IV.A), this report and recommendation addresses the allegations against each individual doctor.

### 1.  Dr. Bell (Staton)

Dr. Bell served as medical director at Staton from September 5, 2017, until March 31, 2018, while employed by Corizon. Doc. 78-1 at 2–3. He continued in that position under Wexford until July 1, 2018. Doc. 78-1 at 3. Walker's only allegations against Dr. Bell center around the treatment of Walker's kidney disease

and Dr. Bell's alleged failure in 2018 to provide a kidney transplant or erythropoietin shots.  *See* Doc. 45 at 17, 19–20.  For the reasons discussed above, Walker's general allegations relating to the treatment of his kidney disease cannot create a triable issue of fact for a jury on his deliberate indifference claim.  *See* Part IV.A *supra*.

### 2.    Dr. Stone (St. Clair)

Walker alleges that Dr. Stone, the medical director at St. Clair, was informed that Walker was suffering from untreated kidney disease that could be improved with shots provided by a specialist outside of the prison, but that Stone failed to take action to arrange outside care or address Walker's issues.  Doc. 45 at 13, 18–20.  Walker also alleges that Dr. Stone's prescription of Bactrim, an antibiotic, for a kidney infection caused an adverse reaction that resulted in heart damage.  Doc. 45 at 16; Doc. 69-5 at 112; Doc. 79 at 2; Doc. 82 at 3; Doc. 83 at 5; Doc. 84 at 3.

First, Walker's allegations of deliberate indifference against Dr. Stone related to treatment of his kidney disease cannot create a triable issue of fact for a jury.  Walker's allegations amount to nothing more than an assertion that he did not receive the specific treatment that he requested and desired.  As discussed above (*see* Part IV.A *supra*), that assertion cannot support a finding of a constitutional violation.  An allegation that Dr. Stone's actions prevented Walker from receiving "the medical attention he deemed appropriate" does not suffice.  *Abel*, 661 F. Supp. 2d at 1373.

Likewise, Dr. Stone's prescription of Bactrim, even if it resulted in an adverse

reaction, cannot support a finding of deliberate indifference. The mere fact of an inmate's injury is insufficient to support a claim of deliberate indifference. *See Bass*, 550 F.2d at 231–32. Rather, deliberate indifference requires that a doctor ignored or failed to treat a patient. *See McElligott*, 182 F.3d at 1255. Walker has not alleged or identified any specific facts, nor produced any other evidence, that Dr. Stone provided treatment that was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Keohane*, 952 F.3d at 1266. Rather, he alleges that Dr. Stone's treatment was deficient only because it resulted in an adverse reaction that Dr. Stone did not foresee. Without more, any such mistake is at most negligent, and not a violation of the constitutional right to adequate medical care. *Estelle*, 429 U.S. at 105–106.

### 3. Dr. Borowicz (Staton)

Dr. Borowicz is the medical director at Staton. Doc 69-3 at 3. Walker avers that Dr. Borowicz had permission from ADOC officials to send Walker to Dr. Avery at the Montgomery Cancer Center in March 2019 in an attempt to identify the cause of Walker's acute anemia. Doc. 83 at 2, 3. Medical records reflect that, based on Dr. Avery's recommendation, Walker underwent a bone marrow biopsy, which was then used to rule out a number of diseases. Doc. 53 at 4; Doc. 69-3 at 10–11. The following month, Walker was transferred to St. Clair, so Dr. Borowicz did not provide any further care to him. Doc. 69-3 at 4; Doc. 83 at 3.

In his response, Walker alleges only that "prison officials" sent him to St. Clair for pre-dialysis, that "prison officials" denied him a return trip to Dr. Avery, and that ADOC officials denied him shots, all of which allowed his kidney condition to worsen. Doc. 83 at 3.

But Walker fails to show how a reasonable jury could find that any of Dr. Borowicz's alleged conduct rises to the level of deliberate indifference. First, Walker argues that unspecified "prison officials"—not Dr. Borowicz—sent him to St. Clair and denied follow-up appointments with Dr. Avery. Doc. 83 at 3. Further, the evidence demonstrates that Dr. Borowicz considered Walker's medical issues, determined that Walker should be examined by a specialist, and then referred Walker to Dr. Avery. Doc. 69-5 at 177–78. Dr. Borowicz's medical care of Walker ended soon thereafter. Doc. 69-3 at 4; Doc. 83 at 3. Based on the record evidence, Walker has not alleged or identified any specific facts based on which a reasonable jury could find that Dr. Borowicz had a subjective knowledge of a risk of serious harm and subsequently disregarded that risk. *See Keohane*, 952 F.3d at 1266.

Moreover, to the extent the Walker argues that Dr. Borowicz was deliberately indifferent for failing to provide the specific treatment for Walker's kidney condition that Walker believed would have been more effective, that argument fails (as discussed above, *see* Part IV.A *supra*).

### 4. Dr. Kassamali (St. Clair)

Walker alleges that in April 2019 when he first met Dr. Kassamali, his nephrologist contracted by ADOC,[11] Dr. Kassamali told him that "the ADOC Committee" would approve only dialysis for him. Doc. 83 at 4. Walker alleges that on November 19, 2021, Dr. Kassamali told him that he could only be helped by a kidney transplant. Doc. 79 at 2–3. In contrast, by affidavit Dr. Kassamali clearly states that Walker is not now, and has never been, a candidate for a kidney transplant or erythropoietin injections. Doc. 70-1 at 7. Instead, in Dr. Kassamali's opinion, treatment by dialysis is the medically appropriate course of action. Doc. 70-1 at 7. While Walker clearly disagrees with Dr. Kassamali's prognosis, Walker does not provide any evidence which reflects that, given his medical conditions, treatment by dialysis could amount to constitutionally inadequate medical care. The record contains no indication that Walker ever was recommended as a candidate for a

---

[11] Dr. Kassamali argues that he is a private doctor and not a governmental actor for purposes of § 1983. Doc. 70 at 19–20. Generally speaking, a private doctor does not act "under color of state law." *See, e.g.*, *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). And a private doctor's treatment of patients who happen to be prisoners does not support a § 1983 claim. *Allen v. Patel*, 2022 WL 885649, at *5 (M.D. Ala. Feb. 8, 2022). But, in this case, Dr. Kassamali treats Walker pursuant to a contract between Eastern Nephrology and Wexford. Doc. 70-1 at 2. Such a contractual relationship can be sufficient to support a § 1983 claim. *See, e.g.*, *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009) ("[W]hen a person accepts employment with a private entity that contracts with the state, he understands that he is accepting the responsibility to perform his duties in conformity with the Constitution.").

kidney transplant or erythropoietin injections; in fact, the record only contains evidence to the contrary. *See* Doc. 70-1 at 7.

Even assuming that Dr. Kassamali's treatment of Walker is in some way inadequate or divergent from the course of treatment that another nephrologist would pursue, or that Walker would choose, these allegations alone are insufficient to create a triable issue of fact for a jury on a claim of deliberate indifference. *See Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) ("Nothing in our case law would derive a constitutional deprivation from a prison physician's failure to subordinate his own professional judgment to that of another doctor; to the contrary, it is well established that 'a simple difference in medical opinion' does not constitute deliberate indifference." (quoting *Waldrop*, 871 F.2d at 1033)). As discussed above, Walker cannot show that his medical treatment was constitutionally deficient just because he wanted different treatment. *See* Part IV.A *supra*.

*        *        *

As explained above, Walker fails to allege or identify specific facts sufficient to create a triable issue of fact for a jury on any of his claims of deliberate indifference against the individual doctors. In addition, it does not appear that Walker alleged any state law claims along with his federal claims under § 1983. However, even if Walker intended to raise a state law claim, such claim would be due to be dismissed without prejudice for lack of subject matter jurisdiction based

on the recommendation that the court dismiss all of the claims over which the court has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (allowing district courts to decline to exercise supplemental jurisdiction over a claim where "the district court has dismissed all claims over which it has original jurisdiction").

## RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that the court **GRANT** Defendants' motions for summary judgment (Doc. 59; Doc. 60; Doc. 61; Doc. 69; Doc. 70; Doc. 78), and **DISMISS WITH PREJUDICE** Plaintiff Walker's complaint, because there is no triable issue of fact for a jury. *See also* 28 U.S.C. § 1915A (dismissal with prejudice on statute of limitations grounds); *supra* Part I.

## NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those

same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and recommendations. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this July 29, 2022.

_____

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE